1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

United States District Court
Northern District of California

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

CARMEL FINANCING, LLC,

　　　　　Appellant,

　　v.

SCHOENMANN,

　　　　　Respondent.

Case No. 3:21-cv-07387-WHO

**ORDER ON BANKRUPTCY APPEALS**

Appellant and cross-respondent Carmel Financing, LLC ("Carmel") loaned debtor Mayacamas Holdings LLC ("Mayacamas") $2,000,000 to refinance its purchase of a parcel of land, secured by a deed of trust. Mayacamas entered bankruptcy proceedings and, soon after, the Tubbs Fire burned through the land. In these consolidated appeals, the parties challenge the Bankruptcy Court's orders (1) finding that bankruptcy trustee E. Lynn Schoenmann ("the Trustee") can use her "strong-arm" powers to avoid Carmel's security interest in insurance proceeds from the fire, (2) dismissing the Trustee's claim that certain default loan terms were unlawful, and (3) declining to award the Trustee's attorney's fees.

The Bankruptcy Court's judgment is affirmed in part, reversed in part, and remanded. I agree with the Bankruptcy Court that the Trustee can avoid Carmel's interest in the insurance proceeds and its grant of summary judgment is affirmed. I disagree with its other two determinations. On the first, it applied incorrect choice-of-law principles to dismiss the Trustee's claim. On the second, it incorrectly held this action did not fall within the attorney's fees statute at issue. Its bottom-line conclusions about these issues may be correct in the end, but the case is remanded for it to address them under the proper tests in the first instance.[1]

---

[1] Oral argument is unnecessary because the facts and legal arguments are adequately presented in

**BACKGROUND**

**I.    FACTUAL BACKGROUND**

Mayacamas, the debtor in this bankruptcy proceeding, acquired a parcel of land in Sonoma County, California ("the Sonoma Property") in 2006. *See* Stipulation Between Trustee and Carmel Holdings, LLC ("Stip.") [2 AA 4–10] ¶¶ 1–2.[2]  Mayacamas purchased it with a $2,000,000 loan, secured by a deed of trust, from Tom Steyer. *Id.* ¶ 3.  In April 2014, Mayacamas and Carmel executed a promissory note to refinance that loan, paying Steyer the outstanding amount and releasing the deed of trust. *See id.* ¶ 3; *see also* Promissory Note ("PN") [2 AA 12–15].  Under that promissory note, Carmel would give Mayacamas a loan with a principal amount of $2,000,000 with a six percent annual interest rate. PN at 12.  The note was secured by a first priority deed of trust that encumbered the Sonoma Property. *Id.* § 2; *see also* Deed of Trust ("DOT") [2 AA 17–28].

Several provisions of the promissory note are relevant here. The note incorporated the terms of the deed of trust. PN § 2. It had a maturity date of May 8, 2015. *Id.* §4(a); *see also* Stip. ¶ 3 (confirming that handwritten change to May 8, 2015, is accurate and binding). The entire principal and accrued interest were due on that date. PN § 4(a). The note also imposed a $75,000 exit fee on Mayacamas due automatically on the maturity date. *Id.* §§ 4(a), 5. If Mayacamas defaulted, and at any point after the maturity date, the interest increased to 18 percent per year. *Id.* § 3. The note contained a choice-of-law provision that reads as follows:

> This note was negotiated in the State of Colorado, and made by the Company [Mayacamas] and accepted by Holder [Carmel] in the State of Colorado, and the proceeds of this Note were disbursed from the State of Colorado which state the parties agree has a substantial relationship to the parties and to the underlying transaction embodied hereby and in all respects, including, without limiting the

---

the briefs and record, and the decisional process would not be significantly aided. *See* Fed. R. Bankr. P. 8019(b)(3).

[2] Citations are to Case No. 3:21-cv-07387-WHO. Citations to "AA" are to the Appellant's Appendix, which is filed in three volumes at Dkt. Nos. 9-1, 9-2, and 9-3. The numeral preceding "AA" refers to the volume number; the numbers following "AA" refer to the page numbers of the document in the appendix. All citations to the appendix and other documents are to ECF-generated page numbers unless otherwise noted. Citations to briefs are to original page numbers.

United States District Court
Northern District of California

generality of the foregoing, matters of construction, validity and performance, this Note and the obligations arising hereunder shall be governed by, and construed in accordance with, the laws of the State of Colorado applicable to contracts made and performed in such state (without regard to principles of conflict of laws) and any applicable law of the United States of America. To the fullest extent permitted by law, Company hereby unconditionally and irrevocably waives any claim to assert that the law of any other jurisdiction governs this Note and this Note shall be governed by and construed in accordance with the laws of the State of Colorado.

*Id.* § 10 (capitalization altered). The note also provided that Mayacamas submitted to the jurisdiction of courts in Denver, Colorado, for actions "arising out of this Agreement." *Id.* § 11.

Several provisions of the deed of trust are also relevant. As noted, Carmel was the beneficiary of that deed, which secured the promissory note *See* DOT at 17. In the deed, Mayacamas placed in trust, among other things, "insurance policies (whether or not required to be carried by [Mayacamas] pursuant to the terms hereof), together with insurance payments and unearned insurance premiums" and "claims, demands, awards, settlements and other payments arising or resulting from or otherwise relating to any insurance (whether or not [Carmel] is named as a loss payee of such insurance." *Id.* ¶ (f). Mayacamas also granted Carmel, under the Uniform Commercial Code of Colorado, a security interest in, among other things, these insurance-related intangibles. *See id.* at 18 (defining "intangibles" to include the foregoing insurance-related rights and granting a security interest in them). The deed referenced the promissory note and loan made under it as the secured agreement. *Id.* at 18–19. The deed also obligated Mayacamas to insure improvements on the property against hazards (to the extent they were not otherwise insured) as Carmel "may reasonably require." *Id.* § 3.2. It provided that "[t]he amount collected by [Mayacamas] under any insurance policy may be applied by [Carmel] upon any indebtedness secured hereby." *Id.* The deed also had a lengthy choice-of-law and jurisdiction provision that, in short, provided that Colorado law applied to any issue arising under or related to it. *Id.* § 11. The parties stipulated that the deed of trust was "duly recorded" in Sonoma County. Stip. ¶ 4.

When the promissory note and deed of trust were executed, the Sonoma Property was insured against fire by Philadelphia Indemnity Insurance Company ("Philadelphia Indemnity") for a policy that lasted from April 6, 2014 to April 6, 2015 ("the 2014–15 Policy"). Stip. ¶ 5; *see also* 2 AA, Ex. 3. Steyer was listed as a "mortgagee" on that policy. Stip. ¶ 5. The parties agree that

United States District Court
Northern District of California

1 Carmel did not provide Philadelphia Indemnity with its deed of trust or promissory note, and did

2 not notify it that it was a mortgagee or ask that it be added to the policy. *Id.* ¶ 6. In January 2015,

3 Philadelphia Indemnity sent Mayacamas's insurance broker a document stating that the policy

4 would expire soon and that, to renew it, the broker must "update and return the attached renewal

5 survey" and could "update any changes and email or fax it back to us." 2 AA 84. Mayacamas's

6 broker sent it to Mayacamas, which made several handwritten edits. Relevant here, on the

7 "Additional Insured(s) Schedule," Mayacamas crossed out Steyer's name and address under

8 "Additional Insured" and wrote in Carmel's name and address. 2 AA 97. Mayacamas's broker

9 emailed back the form. 2 AA 100–01. Philadelphia Indemnity subsequently issued three further

10 insurance policies, for year-long periods from April 6, 2015 to 2016, 2016 to 2017, and 2017 to

11 2018, respectively. Stip. ¶¶ 9–11. None of those updated policies identified Carmel as a loss

12 payee or mortgagee. *Id.* Steyer was still (mistakenly) identified as the mortgagee on the 2017–18

13 policy. *Id.* ¶ 15.

14   On April 7, 2017, Mayacamas filed a Chapter 11 bankruptcy petition, which was later

15 converted to a Chapter 7 proceeding. *Id*. ¶¶ 14, 15. The Trustee was appointed for both. *Id.*

16   On October 8, 2017, the Tubbs Fire broke out in Sonoma County, reached the Sonoma

17 Property, and "destroyed [its] buildings, improvements, and much of [its] flora and fauna." *Id.*

18 On October 13, 2017, Mayacamas's manager sent an email to the insurance broker that, as the

19 parties stipulate, "direct[ed] it to add Carmel as a 'Mortgagee/Lend Loss payable to the policy

20 effective immediately.'" *Id.* ¶ 16; *see also* 2 AA, Ex. 9 (copy of email). That day, Philadelphia

21 Indemnity issued a document replacing Steyer with Carmel as mortgagee and as the loss payee.

22 *Id.* ¶ 17.

23   On October 18, 2017, the Trustee presented a claim to Philadelphia Indemnity and

24 received $2,107,438.76 in insurance proceeds. *Id.* ¶ 19. The Bankruptcy Court approved $500,00

25 of that for use cleaning up the Sonoma Property. *Id.* $1,688,906.07 now remains with the

26 Trustee, unspent. *Id.*

27 **II.**  **PROCEDURAL BACKGROUND**

28   In April 2019, the Trustee filed an adversary proceeding in the bankruptcy against 23

United States District Court
Northern District of California

defendants, including Carmel.  *See* Memorandum Decision on Motion to Dismiss ("MTD Op.") [1 AA 43–54]; Memorandum Decision Regarding Cross-Motions for Summary Judgment ("MSJ Op.") [3 AA 4–11].[3]

In September 2019, the Bankruptcy Court granted in part and denied in part Carmel's motion to dismiss the adversary proceeding.  *See generally* MTD Op.  First, the court found that California law governed "issues pertaining to the [deed of trust], the [Sonoma] Property, and the Insurance Proceeds" but that Colorado law applied "when interpreting, enforcing, or resolving a challenge to terms of the [promissory] Note."  *Id.* 8.  Next, the court held that the Trustee had failed to state a claim that the increased 18 percent default interest rate, late charges, and exit fee were invalid; the Trustee had argued that California law barred them, but because the Bankruptcy Court held that Colorado law governed, it rejected her argument.  *Id.* 8–9.  Last, the court found adequately pleaded the Trustee's claim that the estate, not Carmel, was entitled to the insurance proceeds.  *Id.* 9–11.  I denied Carmel's application for leave to file an interlocutory appeal. *Schoenmann v. Carmel Fin. LLC*, No. 19-CV-06895-WHO, 2020 WL 95553 (N.D. Cal. Jan. 8, 2020).  In November 2020, the Bankruptcy Court granted the Trustee's motion (and denied Carmel's motion) for summary judgment on the issue of entitlement to insurance proceeds.  *See generally* MSJ Op.  It later denied the Trustee's motion for attorney's fees.  The Bankruptcy Court ultimately entered judgment under Federal Rule of Civil Procedure 54(b) for the claims involving Carmel.

## LEGAL STANDARD

## I.   APPELLATE STANDARDS OF REVIEW

Review of orders granting motions to dismiss under Federal Rule of Procedure ("FRCP") 12(b)(6) and summary judgment is *de novo*.  *Desire, LLC v. Manna Textiles, Inc.*, 986 F.3d 1253, 1259 (9th Cir. 2021); *Pirani v. Slack Techs., Inc.*, 13 F.4th 940, 946 (9th Cir. 2021).  While a decision about attorney's fees can involve different issues reviewed under different legal standards, the issue on appeal is whether this action is statutorily eligible for attorney's fees, which

---

[3] Citations to the Bankruptcy Court's MTD Op. and MSJ Op. use those decisions' original page numbers.

is reviewed *de novo*. *McKinney-Drobnis v. Oreshack*, 16 F.4th 594, 603 (9th Cir. 2021) (holding that questions of law, including statutory interpretation, are reviewed *de novo*); *Douglas E. Barnhart, Inc. v. CMC Fabricators, Inc.*, 211 Cal. App. 4th 230, 237 (2012) (holding that the "legal basis for an award of attorney fees" under the relevant statute is a question of law).

## II.       SUMMARY JUDGMENT

Summary judgment on a claim or defense is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). To prevail, a party moving for summary judgment must show the absence of a genuine issue of material fact with respect to an essential element of the non-moving party's claim, or to a defense on which the non-moving party will bear the burden of persuasion at trial. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). Once the movant has made this showing, the burden then shifts to the party opposing summary judgment to identify "specific facts showing there is a genuine issue for trial." *Id.* The party opposing summary judgment must then present affirmative evidence from which a jury could return a verdict in that party's favor. *Anderson v. Liberty Lobby*, 477 U.S. 242, 257 (1986).

On summary judgment, the court draws all reasonable factual inferences in favor of the non-movant. *Id.* at 255. In deciding a motion for summary judgment, "[c]redibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge." *Id.* However, conclusory and speculative testimony does not raise genuine issues of fact and is insufficient to defeat summary judgment. *See Thornhill Publ'g Co., Inc. v. GTE Corp.*, 594 F.2d 730, 738 (9th Cir. 1979).

## III.      MOTION TO DISMISS FOR FAILURE TO STATE A CLAIM

Under FRCP 12(b)(6), a court must dismiss a complaint if it fails to state a claim upon which relief can be granted. To survive a Rule 12(b)(6) motion to dismiss, the plaintiff must allege "enough facts to state a claim to relief that is plausible on its face." *See Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). A claim is facially plausible when the plaintiff pleads facts that "allow the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *See Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (citation omitted). There

United States District Court
Northern District of California

6

1    must be "more than a sheer possibility that a defendant has acted unlawfully." *Id.* While courts

2    do not require "heightened fact pleading of specifics," a plaintiff must allege facts sufficient to

3    "raise a right to relief above the speculative level." *See Twombly*, 550 U.S. at 555, 570.

4           In deciding whether the plaintiff has stated a claim upon which relief can be granted, the

5    court accepts the plaintiff's allegations as true and draws all reasonable inferences in favor of the

6    plaintiff. *See Usher v. City of Los Angeles*, 828 F.2d 556, 561 (9th Cir. 1987). However, the court

7    is not required to accept as true "allegations that are merely conclusory, unwarranted deductions of

8    fact, or unreasonable inferences." *See In re Gilead Scis. Sec. Litig.*, 536 F.3d 1049, 1055 (9th Cir.

9    2008).

10                                          **DISCUSSION**

11          District courts have jurisdiction to hear appeals from final judgments, orders, and decrees

12   of bankruptcy courts under 28 U.S.C. § 158(a)(1). The Bankruptcy Court entered judgment under

13   FRCP 54(b) on these parties' claims, which is appealable. *See* Fed. R. Civ. P. 54(b).

**I.    INSURANCE PROCEEDS**

15          The first issue in this appeal is whether the Bankruptcy Court erred when it granted

16   summary judgment to the Trustee that she could avoid Carmel's interest in the insurance proceeds.

17   *See* Appellant's Principal Brief ("Open. Br.") [Dkt. No. 9] 2–4. I conclude the Bankruptcy Court

18   was correct.

19          Both parties agree that Carmel had a security interest in the insurance proceeds. *See id.*

20   10–11; Respondent/Cross Appellant's Response Brief and Principal Brief ("Resp. Br.") [Dkt. No.

21   10] 8 (discussing "Carmel's security interest in the insurance proceeds"). To avoid that interest,

22   however, the Trustee invoked her "strong-arm" powers under 11 U.S.C. § 544(a)(1).[4] Under that

23   statute, "[w]hen a debtor goes into bankruptcy, the bankruptcy trustee is automatically granted a

---

[4] That statute provides that "[t]he trustee shall have, as of the commencement of the case, and
without regard to any knowledge of the trustee or of any creditor, the rights and powers of, or may
avoid any transfer of property of the debtor or any obligation incurred by the debtor that is
voidable by . . . a creditor that extends credit to the debtor at the time of the commencement of the
case, and that obtains, at such time and with respect to such credit, a judicial lien on all property
on which a creditor on a simple contract could have obtained such a judicial lien, whether or not
such a creditor exists." 11 U.S.C. § 544(a)(1).

United States District Court
Northern District of California

1  judicial lien over all property the debtor owns as of the petition date." *In re Pettit Oil Co.*, 917

2  F.3d 1130, 1133 (9th Cir. 2019) (citing 11 U.S.C. § 544(a)(1)). If a creditor "wish[es] to shield a

3  particular asset from the reach of the trustee," it "can do so only if the creditor can show that its

4  interest in the asset is superior to a judicial lien, a determination governed by various statutory

5  priority rules." *Id.* If it cannot make that showing, "the trustee's judicial lien remains superior and

6  the trustee can 'avoid' (i.e., block) any transfers of the asset outside the bankruptcy estate." *Id.*

7  "Although the Bankruptcy Code provides the Trustee the status of a judgment lien creditor, the

8  powers the Trustee wields in that role are defined by California law." *In re Sale Guar. Corp.*, 220

9  B.R. 660, 669 (B.A.P. 9th Cir. 1998), *aff'd*, 199 F.3d 1375 (9th Cir. 2000).

10  A trustee using her strong-arm powers can generally "'avoid' security interests that are

11  unperfected under applicable state law." *In re First T.D. & Inv., Inc.*, 253 F.3d 520, 526 (9th Cir.

12  2001) (internal quotation marks and citation omitted). California law provides that a judicial

13  lien—and therefore a trustee using her strong-arm powers—generally has priority over an

14  unperfected security interest. *See* Cal. Com. Code § 9317(a) ("A security interest or agricultural

15  lien is subordinate to the rights of. . . a person that becomes a lien creditor before . . . the security

16  interest or agricultural lien is perfected."). As a result, "unperfected security interests are

17  avoidable and can be relegated to the status of general unsecured claims." *First T.D.*, 253 F.3d at

18  525.

19  Under California law, as a general rule, "[a] security interest in, or claim in or under, any

20  policy of insurance, including unearned premiums, may be perfected only by giving written notice

21  of the security interest or claim to the insurer." Cal. Com. Code § 9312(b)(4).[5] The Bankruptcy

22  Court, Carmel, and the Trustee agree that *a* communication, described above and again below, was

23  sent to Philadelphia Indemnity. The Bankruptcy Court held, however, that the notice was

24  insufficient under the statute as a matter of law.

25

26

27  _____

[5] Neither party challenges the Bankruptcy Court's holding that California law governs this
28  determination and both apply California law to the question in their briefs. *See, e.g.*, Open Br. 13;
Resp. Br. 11.

United States District Court
Northern District of California

1

### A.  Whether Notice Was Required

Carmel first argues that the Bankruptcy Court's decision should be reversed because, contrary to its findings, no Section 9312(b)(4) notice was required at all.  *See* Open. Br. 16–21.  Carmel argues this because a notice under this statute is "a private, non-public notice, sent only to the insurer which would impart notice only to that insurer, not other creditors."  *Id.* 18.  As a result, it asserts, "the giving of such a non-public notice is irrelevant to the issue of entitlement to the insurance proceeds as between the secured party and the trustee."  *Id.*

Carmel is incorrect.  Section 9312(b)(4) is unambiguous: "[a] security interest in . . . any policy of insurance . . . may be perfected ***only*** by giving written notice of the security interest . . . to the insurer."  Cal. Com. Code § 9312(b)(4) (emphasis added).  Said otherwise, there is one—and only one—way to perfect a security interest in an insurance policy: written notice to the insurer.  When statutory language is clear and unambiguous, it generally governs.  *Herrera v. Zumiez, Inc.*, 953 F.3d 1063, 1071 (9th Cir. 2020); *Weiss v. City of Del Mar*, 39 Cal. App. 5th 609, 622 (2019) (collecting cases under California law).  The Legislature could have required that, to perfect a security interest in an insurance policy, a party file a financial statement, as is required to perfect most security interests.  *See* Cal. Com. Code § 9310(a) ("Except as otherwise provided in subdivision (b) and in subdivision (b) of Section 9312, a financing statement must be filed to perfect all security interests and agricultural liens.").  But the Legislature explicitly carved out an exception from that general rule for security interests in insurance policies.  *See id.* (providing that filing a financial statement is required "[e]xcept as otherwise provided in subdivision (b) and in subdivision (b) of Section 9312").

Carmel urges that I ignore this clear statutory requirement by resorting to the general purpose of perfection of interests.  Usually, it points out, interests are perfected so that subsequent parties will be on notice of the existence of the interest.  *See* Open. Br. 16–21.  That is why, for instance, perfection is usually accomplished through filing a financial statement.  *See, e.g.*, Cal. Com. Code § 9310(a).  Here, Carmel contends, notice to the insurer would never put a putative future lienholder on notice of the existence of the interest, so it would make little sense to apply it.  Open Br. 16–21.  But regardless of the merits of this argument as a matter of policy, the

United States District Court
Northern District of California

1    bankruptcy statute is clear that state-law priority rules govern strong-arm determinations and state

2    law is clear that perfection of interests in insurance proceeds occurs only through notice to the

3    insurer.  I recognize that one bankruptcy judge, in a footnote of an unpublished decision marked

4    not for citation, appears to have endorsed Carmel's position.  *See In re Ireva Holdings, LLC*, No.

5    09-48102-D-11, 2011 WL 10656544, at *3 n.7 (Bankr. E.D. Cal. May 26, 2011).  But that court

6    cited no authority for its view that this clear statutory language can be ignored.  *See id.*  Instead, it

7    conflated that holding with the related but distinct principle of California law that the loss payable

8    provision in an insurance policy solely defines the insurer's obligations, not who is ultimately

9    entitled to the proceeds.  *See Ziello v. Superior Ct.*, 36 Cal. App. 4th 321, 330 (1995).  That is

10   different than whether an interest is perfected—under California law, the two just happen to

11   involve contacting the insurance company.  Courts cannot disregard otherwise applicable and clear

12   statutory requirements simply because they do not think that they are all that effective at serving

13   their purpose, even assuming this one is not.  *Cf. People v. Arendtsz*, 247 Cal. App. 4th 613, 619

14   (2016) ("We cannot rewrite [the statute] to conform to defendant's notion of what the Legislature

15   would want it to say.").

16        Carmel also appears to argue that, because it was legally owed the insurance proceeds under

17   the agreement, it should have been named a loss payee on the insurance policy and that, this aside,

18   it is the loss payee as a matter of law.  Open Br. 26–31.  I need not address whether either is true

19   because, regardless, the relevant question for present purposes is whether the trustee's strong-arm

20   powers prevail over Carmel's interest.  As explained, for Carmel to prevail, it had to perfect its

21   interest under the statute regardless of what else happened.  It does not dispute that this is so.  *See,*

22   *e.g.*, *id.* 15 ("[W]hile the Trustee makes much of the *wholly irrelevant* fact that Carmel was not

23   listed as a loss payee under the Policy, that is actually a red herring." (emphasis added)); *id.*

24   (making an argument about what would occur "even if the designation of the loss payee in the

25   Policy were relevant"); Appellant and Cross-Respondent's Reply Brief on Appeal ("App. Reply")

26   [Dkt. No. 11] 2 ("[T]he issue on this appeal is solely one of perfection of that security interest.");

27   *id.* (arguing that "to the extent that it may be of significance" to rebut the Trustee's affirmative

28   argument, "Carmel is a loss payee"); *id.* 3 ("[T]he Trustee's Brief seeks to impose a requirement

1   that Carmel be listed as a loss payee under the insurance policy in order to perfect its security

2   interest, when there is no such requirement in any statute or case law under the Policy.").

3   **B.  Whether the Notice Was Sufficient**

4   Carmel next argues that, assuming notice to the insurer is required, the January 2015 note

5   on the policy renewal letter was sufficient.  I agree with the Bankruptcy Court that it was not.

6   The facts surrounding this communication are not in dispute.  *See supra* Background,

7   Section I.  In January 2015, Philadelphia Indemnity sent Mayacamas's insurance broker a

8   document stating that the policy would expire soon and that, to renew it, the broker must "update

9   and return the attached renewal survey" and could "update any changes and email or fax it back to

10  us." 2 AA 84.  Mayacamas crossed out Steyer's name and address under "Additional Insured" and

11  wrote in Caramel's name and address.  2 AA 97.  Philadelphia Indemnity subsequently issued

12  three insurance policies that did not name Carmel as a loss payee or mortgagee.  *Id.*  Steyer was

13  still identified as the mortgagee on the 2017–18 policy.  *Id.* ¶ 15.  (Later, after the bankruptcy

14  began and the fire occurred, this was corrected.  *See supra* Background, Section I.)

15  There is no precedent from California's courts that either party has pointed to interpreting

16  what "notice" is sufficient under Section 9312(b)(4), but under any reasonable understanding, this

17  2015 communication does not qualify.  The statute requires "written notice of the security

18  interest," but there is nothing about this communication that would put a reasonable person on

19  notice of the existence of Carmel's security interest in the proceeds.  Certainly, the communication

20  is not *explicit* that Carmel possessed a security interest.  Instead, at most, Mayacamas was

21  communicating that it wished to name Carmel as an additional insured.

22  To get around this, Carmel argues that it is *implicit* or *obvious* that this note meant that

23  Carmel had a security interest.  *See* Open. Br. 21–26.  To make that argument, it observes that

24  other insurance documents listed Steyer as a mortgagee and that, on this form, Mayacamas crossed

25  out Steyer's name and replaced it with Carmel's.  *Id.*  Even assuming that this form of pseudo-

26  constructive notice of a change in mortgagee status could suffice to perfect a security interest

27  under the statute, it does not on these facts.  Again, *this* form merely listed Steyer as an additional

28  insured.  Mayacamas then replaced him, without explanation or even any comment, with Carmel.

United States District Court
Northern District of California

11

That *other* forms indicated Steyer was a mortgagee does not transform *this* one into a notice that Steyer was being replaced as a mortgagee with Carmel.  Carmel also repeatedly conflates these, arguing that it is clear at least that Carmel was named as a mortgagee.  *See id.*  But the "mortgage schedule" and "additional insured schedule" are different parts of the insurance contract, *see, e.g.*, 2 AA 33; Carmel's attenuated notice argument fails on its own terms.  There is also not an automatic or necessary connection between the two: someone can be an additional insured without being a mortgagee.[6]  *Cf., e.g., Fruehauf Corp. v. Royal Exch. Assur. of Am., Inc.*, 704 F.2d 1168, 1171 (9th Cir. 1983) (discussing the situation in which "a mortgagor agrees to have a mortgagee named as an additional insured").  And, for what it is worth, Philadelphia Indemnity plainly did not take this oblique hint as any sort of notice of a security interest: Carmel was never listed on the policy or in any of its records, even to be replaced as an additional insured.  I fully take Carmel's point that the statute requires *notice*, not some reciprocation by the insurance company, so if the notice sent was sufficient, it would likely be irrelevant what the insurance company's response was.  But that there is no evidence that the insurance company factually understand this notice in the way Carmel now wishes to cast it is "extra icing on a cake already frosted."  *Yates v. United States*, 574 U.S. 528, 557 (2015) (Kagan, J., dissenting).

Carmel also relies on the existence of the recorded deed of trust to argue that the security interest was publicly available knowledge.  Open Br. 15 ("[T]he pre-petition recording of Carmel's Trust Deed, which is not in dispute, was sufficient to perfect Carmel's interest in the Insurance Proceeds, regardless of any written notice to the Carrier or purported lack thereof."); *see also id.* 31–34.  But the deed of trust merely *created* the security interest in the insurance proceeds, it does not *perfect* it.  *See* Cal. Com. Code § 9317(a) (discussing how already existing security interests are perfected); 4 Witkin, Summary of Cal. Law 11th Sec. Trans. § 59 (discussing significance of perfection).  Perfection takes an additional step which, under California law, is the

---

[6] In response, Carmel argues that this is the best—in its view, the only—place on the form to make this change.  But there is no reason that this form needed to be utilized to provide notice.  No matter what internal forms an insurance company uses, the statute requires notice—indeed, on Carmel's argument any sort of notice (in an official form or not) would suffice.

1    notice to the insurer, not recording of the deed.  *See* Cal. Com. Code § 9312(b)(4).

2         For clarity, I need not and do not determine the complete universe of notices that would

3    satisfy the statute, nor do I hold that certain magic words or special procedures are required.  I just

4    hold that the Bankruptcy Court correctly determined that this particular communication is not a

5    notice sufficient to perfect Carmel's security interest.[7]

6    **C.  Equitable Lien**

7         Carmel next argues that, at the very least, the Bankruptcy Court should have imposed an

8    equitable lien on the insurance proceeds and that such a lien would prevail over the Trustee's

9    strong-arm powers.  Open Br. 31–34.  The Bankruptcy Court declined to impose an equitable lien

10   for two independent reasons: (1) Carmel was not added as an additional insured on the policy and

11   (2) analogizing to the law of constructive trusts, the court held there was no wrongful or

12   inequitable act by the Trustee sufficient to warrant that remedy.  MSJ Op. 7–8.  The Bankruptcy

13   Court's decision is affirmed because, regardless of whether an equitable lien should be imposed,

14   on these facts it would not prevail over the Trustee's strong-arm powers.  *See U.S. ex rel. Ali v.*

15   *Daniel, Mann, Johnson & Mendenhall*, 355 F.3d 1140, 1144 (9th Cir. 2004) ("We may affirm a

16   grant of summary judgment on any ground supported by the record.").

17        One preliminary note is that there has been some imprecision about the nature of equitable

18   liens in the record.  Usually, they are conceived of as equitable *remedies* imposed by the court.

19   *See, e.g.*, 51 Am. Jur. 2d Liens § 34 ("In addition to these elements, because such liens are based

20   on the principles of equity, the lienor must satisfy the court that in equity and good conscience the

21   lienor is entitled to a lien, and that the lienor has no adequate remedy at law.").  Often, however,

22   Carmel appears to speak of it as having been created by operation of the agreement.  *See* Open. Br.

23   31–34.  Neither party has explicitly argued that this changes the outcome, so I do not further

24   address it.  Additionally, both parties treat this is an issue of law subject to *de novo* review rather

25

26   ───────────────

27   [7] The Trustee contends that Carmel could have shown priority over her lien by showing it was
     contractually entitled to the insurance proceeds.  Carmel does not advance any argument on this
28   front in its briefing to support its claim—indeed, it affirmatively argues it need not be a loss
     payee—so I do not pass on it.

United States District Court
Northern District of California

1   than an issue of equitable remedy to be reviewed for abuse of discretion. *See* Open. Br. 1–2; Resp.

2   Br. 2; *but see Teutscher v. Woodson*, 835 F.3d 936, 942 (9th Cir. 2016) ("We review for abuse of

3   discretion the district court's award of equitable relief."). So I assume without deciding that a *de*

4   *novo* standard of review applies.

5         On the merits, the Bankruptcy Court's judgment is affirmed. As the Bankruptcy Appellate

6   Panel of the Ninth Circuit has explained, because equitable liens and constructive trusts are

7   "remed[ies], [they] cannot affect rights in the res until [they are] imposed." *In re Markair, Inc.*,

8   172 B.R. 638, 642 (B.A.P. 9th Cir. 1994). Consequently, "[i]f the remedy remains inchoate post-

9   petition . . . it is subordinate to the trustee's strong arm power. The incipient beneficiary of a

10  constructive trust [or equitable lien] has no rights greater than any other creditor of the debtor who

11  has not reduced his claim to judgment and perfected it." *Id.* (citing *In re Tleel*, 876 F.2d 769, 771–

12  72 (9th Cir. 1989)).[8] As a result, if the Bankruptcy Court had imposed an equitable lien in the

13  bankruptcy proceedings, it would be subordinate to the Trustee's strong-arm-based claim. And to

14  the extent the argument is that some hypothetical equitable lien existed by operation of the

15  agreement without judicial involvement, it was not reduced to judgment and not perfected for the

16  reasons explained in the preceding section. *See supra* Section I.B (explaining that all security

17  interests in insurance proceeds must have notice sent to insurance company to be perfected);

18  *Markair*, 172 B.R. at 642 (holding that equitable liens must be reduced to judgment or perfected to

19  have priority).

20        Again, *Ireva* (the unpublished and marked-not-for-citation bankruptcy decision cited above)

21  has taken a different view of equitable liens. According to it, the explanation just given is

22  incorrect because it applies only to "the imposition of an equitable lien or some other equitable

23  remedy (express trust, resulting trust, constructive trust) in the *absence* of a recorded instrument

24

25  ────────────────

     [8] The court phrased some of its discussion in terms of constructive trusts, but the same principles
26  apply to the closely related vehicle of equitable liens. *See Markair*, 172 B.R. at 642; *see also In re*
     *Cedar Funding, Inc.*, 398 B.R. 346, 350 (Bankr. N.D. Cal. 2008) ("Equitable liens are closely
27  related to constructive trusts. (citation omitted)"); 51 Am. Jur. 2d Liens § 30 (similar). Carmel's
     leading case likewise treated the two concepts as similar in this way and understood *Markair* to
28  address both. *See Ireva*, 2011 WL 10656544, at *3.

United States District Court
Northern District of California

sufficient to put a hypothetical judgment lien creditor or bona fide purchaser on constructive notice of the creditor's claims."  2011 WL 10656544, at *3.  And in *Ireva*, as here, "there *was* a recorded instrument sufficient to put a hypothetical judgment lien creditor or bona fide purchaser on constructive notice of [the creditor's] interest in any insurance proceeds; namely, the deed of trust itself."  *Id.*, at *4.  This reasoning again runs into the same basic problem as before: priority based on a security interest is based on perfection which, when it comes to interests in insurance proceeds, "may be perfected only by giving written notice of the security interest or claim to the insurer."  Cal. Com. Code § 9312(b)(4).  I agree with *Ireva* to the extent that, in the real world, a subsequent lienholder might be aware of a potential for an interest in insurance due to the existence of a recorded deed of trust that addressed insurance proceeds.  And recording a deed of trust may be good enough notice for some other legal purposes.[9]  But it does not perfect an interest in insurance proceeds under the statutory framework.[10]

Accordingly, the Bankruptcy Court's grant of summary judgment to the Trustee on this issue is affirmed.

## II.    CHOICE OF LAW FOR DEFAULT PROVISIONS

The Trustee cross-appeals the Bankruptcy Court's dismissal of her claim that certain provisions in the deed of trust that were triggered by default—an increased interest rate, an exit fee, and monthly late charges—were unlawful.  *See* Resp. Br. 24–31.  The Trustee argued in the Bankruptcy Court that California law prohibits them as penalties.  *Id.*  The Bankruptcy Court

---

[9] Speaking of these other purposes: Carmel relies on a group of authorities to argue that "[t]he recording of the Trust Deed gave constructive notice of its contents to any hypothetical judgment lien creditor or bona fide purchaser" and "[c]onstructive or inquiry notice is sufficient to defeat a trustee's avoiding powers."  Open. Br. 33–34 (citations omitted).  But all of its cited authorities are about what is necessary to create notice and avoid strong-arm powers for real property, not insurance proceeds.  A contract of insurance on real property is separate from the underlying property transaction.  *Ziello*, 36 Cal. App. 4th at 329.  In line with that principle, as explained several times in-text, California has imposed different notice and perfection requirements for insurance proceeds than interests in real property.

[10] There may be other problems with Carmel's theory too.  For instance, the deed of trust did not obligate Mayacamas to hold insurance, it just provided that if it did, Carmel had a security interest in it.  But there is no need to decide whether this sort of provision would put a subsequent purchaser or lienholder on notice because the issue is resolved on the grounds discussed.

disagreed and held that while California law governed "issues pertaining to the [deed of trust], the Property, and the Insurance Proceeds," Colorado law governed "when interpreting, enforcing, or resolving a challenge to terms of the [promissory note]."  MTD Op. 8.  Because the Trustee's argument was premised on California law, the Bankruptcy Court dismissed her claim.  *Id.*  In my view, the Bankruptcy Court erred.

In this circuit, "in bankruptcy, federal choice-of-law rules control which state's law applies."  *In re Sterba*, 852 F.3d 1175, 1177 (9th Cir. 2017) (citation omitted).  Generally, "[f]ederal choice of law rules follow the approach of the Restatement (Second) of Conflict of Laws."  *In re Vortex Fishing Sys., Inc.*, 277 F.3d 1057, 1069 (9th Cir. 2002).  Section 187 of the Restatement addresses when a contractual provision selects the law to apply.  *See* Restatement (Second) of Conflict of Laws ("Rest.") § 187.  The Ninth Circuit has said that "we only consider[] the principles stated in the Restatement [] § 187 to the extent we conclude that they are persuasive," *Sterba*, 852 F.3d at 1179 (internal quotation marks, alteration, and citation omitted), but both parties here apply that approach, so I do as well.

As noted, the promissory note included a choice-of-law provision selecting Colorado. Under the Restatement approach, the parties' contractual choice will generally be honored.  *See* Rest. §§ 187(1), 187(2); *Sterba*, 852 F.3d at 1179 ("Ordinarily, when parties to an agreement select the law they want to govern an issue, federal courts will enforce that choice.").  But there are several exceptions.  Two Restatement provisions are relevant.  Under Section 187(1), "[t]he law of the state chosen by the parties to govern their contractual rights and duties will be applied if the particular issue is one which the parties could have resolved by an explicit provision in their agreement directed to that issue."  Rest. § 187(1).  And under Section 187(2):

> The law of the state chosen by the parties to govern their contractual rights and duties will be applied, even if the particular issue is one which the parties could not have resolved by an explicit provision in their agreement directed to that issue, unless either
>
> > (a) the chosen state has no substantial relationship to the parties or the transaction and there is no other reasonable basis for the parties' choice, or
> >
> > (b) application of the law of the chosen state would be contrary to a fundamental policy of a state which has a materially greater interest than the chosen state in the determination of the particular issue and which, under the rule of § 188, would be

United States District Court
Northern District of California

the state of the applicable law in the absence of an effective choice of law by the parties.

Rest. § 187(2).

The Bankruptcy Court incorrectly applied subsection (1) rather than subsection (2). It held that it would "honor the contracting parties' agreement to apply Colorado law when interpreting, enforcing, or resolving a challenge to terms of the Note" based on its understanding of Section 187 that "[w]here the making of a contract is not in dispute, the law chosen by the parties need not have any reasonable relationship to the place of creation or performance of the contract." MTD Op. 6–7 (internal quotation marks and citation omitted). In other words, the Bankruptcy Court held that the exceptions to Section 187(2) need not be examined in these circumstances. *See id.* For that view, the Bankruptcy Court cited only one decision of another bankruptcy judge, *In re CMR Mortgage Fund, LLC*, 416 B.R. 720, 728–29 (Bankr. N.D. Cal. 2009).

Resolving this issue requires understanding the interplay between the two subsections of the Restatement provision. Section 187(1) contains no exceptions; it requires complete deference to the contractual choice-of-law provision. But it also applies only in narrow circumstances: "if the particular issue is one which the parties could have resolved by an explicit provision in their agreement directed to that issue." Rest. § 187(1). Section 187(2), in contrast, does have exceptions and does not require courts to rubber-stamp contractual provisions. But it applies more broadly, any time Section 187(1) does not. *See* Rest. § 187(2) (applying "even if the particular issue is one which the parties could not have resolved by an explicit provision in their agreement directed to that issue"). The comments to the provisions explain that Section 187(1) is really "a rule providing for incorporation by reference and is not a rule of choice of law." Rest. § 187, cmt. c. The idea is that, if the parties have the power to do something anyway, they "may incorporate into the contract by reference extrinsic material which may, among other things, be the provisions of some foreign law." *Id.* Section 187(2) serves a different purpose. As the comments explain, it "applies when it is sought to have the chosen law determine issues which the parties could not have determined by explicit agreement directed to the particular issue." Rest. § 187, cmt. d. Parties cannot, for instance, agree to illegal contracts or agree that one of them has capacity to contract when they lack it under the law. *See id.* And sometimes, questions will arise about which

17

United States District Court
Northern District of California

1    state's law gets to determine these things—imagine, for instance, if a 17-year old agreeing to a

2    contract that Colorado permits 17-year-olds to make but that California prohibits.  In those

3    circumstances, Section 187(2) kicks in and courts must apply the parties' chosen law unless one of

4    the exceptions applies.  To the extent that *CMR Mortgage* or the Bankruptcy Court here read those

5    provisions differently, I disagree with their view, as have other courts, most prominently the

6    California Supreme Court in its leading contractual choice-of-law case.  *See Nedlloyd Lines B.V. v.*

7    *Superior Ct.*, 3 Cal. 4th 459, 465–67 & n.3 (1992).

8              Here, the question to be answered is whether certain contractual provisions are unlawful.

9    The Trustee says they are under California law; Carmel says they are not under either law.  The

10   Bankruptcy Court erred in applying 187(1) and deferring to the contractual choice because this is

11   not a "particular issue . . . which the parties could have resolved by an explicit provision in their

12   agreement directed to that issue."  Rest. § 187(1).  The Bankruptcy Court should have instead used

13   Colorado law as its presumptive starting point and then applied Section 187(2) to ask whether its

14   exceptions applied.  In particular, the Trustee argues that Colorado has "no substantial relationship

15   to the parties or the transaction and there is no other reasonable basis for the parties' choice."

16   Rest. § 187(2).  Her complaint—in which the court would have to credit all well-pleaded

17   allegations—alleged that, despite the contractual representations to the contrary, there was no real

18   connection to Colorado and that, instead, everything substantial about the note is centered in

19   California.  She also argues that the other exception—that it is violative of a fundamental public

20   policy of proper state—would also apply.  Because the Bankruptcy Court never made any findings

21   on either front, this will be an issue for it to resolve in the first instance.[11]

22              Accordingly, the Bankruptcy Court's dismissal of this claim is reversed and the issue is

23   remanded for further proceedings.

24

25

_____

26   [11] Carmel argues that I can affirm the Bankruptcy Court on the ground that California law does not
     prohibit these alleged penalties.  Because the Bankruptcy Court never addressed that issue, I
27   decline to do so for the first time on appeal.  *Planned Parenthood of Greater Washington & N.*
     *Idaho v. U.S. Dep't of Health & Hum. Servs.*, 946 F.3d 1100, 1110 (9th Cir. 2020) ("In general, an
28   appellate court does not decide issues that the trial court did not decide.").

**III.    ATTORNEY'S FEES**

The Trustee appeals the Bankruptcy Court's denial of her motion for attorney's fees.  *See* Resp. Br. 31–35; *see also* Respondent's Appendix ("RA") [Dkt. No. 10-1] at 22–30 (Bankruptcy Court's oral explanation of reasoning).

Under California law, [i]n any action on a contract, where the contract specifically provides that attorney's fees and costs, which are incurred to enforce that contract, shall be awarded either to one of the parties or to the prevailing party, then the party who is determined to be the party prevailing on the contract, whether he or she is the party specified in the contract or not, shall be entitled to reasonable attorney's fees in addition to other costs."  Cal. Civ. Code § 1717(a).  The Trustee argues that the deed of trust here permits attorney's fees.  *See* DOT ¶ 7.  The Bankruptcy Court held that this action was not "on a contract" under the statute and, so, denied the motion.  *See* RA at 22–30 (oral ruling); *id* at 17 (written order denying request "[f]or the reasons stated on the record").  Accordingly, the issue is whether this claim meets the statutory definition. *See, e.g.*, *CMC Fabricators*, 211 Cal. App. 4th at 237.

I conclude that this action was "on a contract" as that term is used in the statute.  "It is difficult to draw definitively from case law any general rule regarding what actions and causes of action will be deemed to be 'on a contract' for purposes of Civil Code section 1717."  *Hyduke's Valley Motors v. Lobel Fin. Corp.*, 189 Cal. App. 4th 430, 435 (2010) (internal quotation marks and citation omitted).  But "California courts construe the term 'on a contract' liberally."  *Turner v. Schultz*, 175 Cal. App. 4th 974, 979 (2009) (internal quotation marks and citation omitted).  That means that it includes not only actions for breach of contract but "also any other action that 'involves' a contract."  *CMC Fabricators*, 211 Cal. App. 4th at 240 (internal quotation marks and citation omitted).  This includes actions both to enforce and "avoid enforcement of" contractual obligations.  *See id.* at 241 (collecting cases).

Here, the Trustee's claim was an attempt to avoid a security interest that arose from the contract—the deed of trust.  That is "on the contract" under California's liberal understanding.  The claim for relief would not exist absent the contract and it depends on it.  It is not separate from the contract as a tort claim would be.  The Trustee was the successor-in-interest to Mayacamas

(one party to the contract), *see Nicholas v. United States*, 384 U.S. 678, 692 (1966), trying to avoid the contractual ramifications Carmel (another party) sought to impose. Relatedly, the California Court of Appeal has held that actions to quiet title that arise out of contracts qualify as actions "on the contract." *See , e.g.*, *Kachlon v. Markowitz*, 168 Cal. App. 4th 316, 348 (2008). While this is not a quiet title action, it has similar features in that it is an attempt to determine the priority of interests in property arising from a contract.

Carmel responds that a Trustee is acting as a judgment lienholder under the strong-arm statute and such a lienholder would not be a party to the contract; indeed, the Bankruptcy Court classified the Trustee as a third party to the contract. RA at 8–9. But while the Trustee is given the *powers* of one who acquired a judicial lien at the outset of the litigation, she was not transmuted into being one; she remains a bankruptcy trustee and, consequently, a successor-in-interest to Mayacamas. *Nicholas*, 384 U.S. at 692; *In re Santa Fe Adobe, Inc.*, 34 B.R. 774, 776 (B.A.P. 9th Cir. 1983) ("Ordinarily, the trustee is [] a successor in interest to the debtor."). The Bankruptcy Court also reasoned that, because the core issue in the matter was perfection, it was not an action "on the contract." But that perfection was of a security interest created by the contract, so it intimately involves the contract and is an attempt to avoid a contractual obligation. *Cf., e.g.*, *CMC Fabricators*, 211 Cal. App. 4th at 240. In a similar (though not identical) situation, the Ninth Circuit has held that avoidance of contractual duties due to the operation of the bankruptcy laws qualifies as an action "on a contract" under the statute. *See In re Penrod*, 802 F.3d 1084, 1088–89 (9th Cir. 2015).[12]

---

[12] Carmel's leading case, in contrast, (which is unpublished) appeared to suggest that, in similar circumstances, a trustee could only recover by "assert[ing] [] claims held by the Debtor," *In re Deuel*, 482 B.R. 323, 332 (Bankr. S.D. Cal. 2012), which as discussed is not California law, *see, e.g.*, *CMC Fabricators*, 211 Cal. App. 4th at 240 (holding that actions to avoid enforcement of contractual rights qualify). That court also held fees "squarely" could be recovered if the creditor had "attempted [to] take [] steps to support the enforceability and priority of its lien based on provisions in its contracts with the Debtor, and [] the Trustee defended against this position." *Deuel*, 482 B.R. at 332. But it is unclear how bringing an action to determine priority (which the court held was not cognizable) is meaningfully different from an action to "support the . . . priority of its lien" (which it held would be). In all events, this case concerns an attempt to avoid enforcement of rights under a contract.

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

The parties get into an extended back-and-forth about whether the other prong of the statute—that the Trustee is a "prevailing party"—is met.  *Compare* App. Reply 22–27, *with* Respondent's/Cross Appellant's Reply Brief [Dkt. No. 12] 9–11.  Unlike the issue just discussed, however, which party counts as "prevailing" under the statute is reviewed for abuse of discretion.  *U.S. for Use of Palmer Const., Inc. v. Cal State Elec., Inc.*, 940 F.2d 1260, 1261 (9th Cir. 1991).  As a result, I would not hazard an opinion on it without the Bankruptcy Court first doing so.  Here, the Bankruptcy Court did indicate in one sentence that, if it had decided in the Trustee's favor on the statutory issue, it would conclude that she prevailed; but it also described that statement as "gratuitous," so it is not clear whether it intended it to be an alternative holding.  *See* RA at 27.  In any event, leaving this issue to be decided on remand is warranted because the attorney's fees issue would have to return to the Bankruptcy Court anyway (and may or may not be affected by that court's disposition of the Trustee's claim that I remand).  It will also not create an extra appeal because the issue can be appealed once attorney's fees were ultimately granted or denied.

Accordingly, the Bankruptcy Court's denial of the motion for attorney's fees is reversed and the issue is remanded for the Bankruptcy Court to determine whether to award fees, and if so in what amount.

## CONCLUSION

The judgment of the Bankruptcy Court is AFFIRMED IN PART, REVERSED IN PART, and REMANDED for further proceedings consistent with this opinion.  Separate judgments will be entered accordingly.

**IT IS SO ORDERED.**

Dated: August 23, 2022

William H. Orrick
United States District Judge